FILED
2012 Sep-20  AM 10:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **TONY J. CLARK,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:11-CV-02557-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On October 22, 2008, the claimant, Tony Clark, applied for disability and disability insurance benefits under Title II of the Social Security Act. (R. 10). The claimant alleges disability commencing on February 15, 2007 because of mild mental retardation, anxiety and depression, lumbar degenerative disc disease, and hypertension. (R.12, 333). The Commissioner denied the claim on March 3, 2009. (R. 68). On April 6, 2009, the claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on June 11, 2010 over which he presided from Greenville, South Carolina. (R. 10). In a decision dated October 26, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act. (R. 7). In addition, the Appeals Council denied the claimant's request for review on October 26, 2010. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the

1

court reverses and remands the decision of the Commissioner.

## II. ISSUES PRESENTED

Whether the ALJ erred in his application of the legal standard for analyzing a combination of mental and physical impairments under listing 12.05(C).

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432 (d)(1)(A) (2004).  To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed;
> (2) Is the person's impairment severe;
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1;
> (4) Is the person unable to perform his or her former occupation;
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to finding a disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In this case, the claimant argues that she should have granted disability under section 12.05.  To be considered for disability benefits under section 12.05, a claimant must at least have (1) significantly subaverage general intellectual functioning; (2) deficits in adaptive behavior; and (3) manifested deficits in adaptive behavior before age twenty-two. *Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11th Cir. 1997). The applicable regulations require the Commissioner of Social Security to consider the combined impact of a claimant's impairments when determining whether the claimant meets or equals the second requirement under section 12.05(C) of the Listing of Impairments. *Davis v. Shalala*, 985 F.2d 528, 530 (11th Cir. 1993). To establish a

disability under section 12.05(C), a claimant must establish: "a valid verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05(C) (1992); *see Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985) (recognizing that "significant" under section 12.05(C) involves something more than slight or minimal but less than "severe"). The Eleventh Circuit, however, has recognized that a valid IQ score need not be conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record on the claimant's daily activities and behavior. *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986).

## V. FACTS

The claimant completed the tenth grade and was forty-two years old at the time of the administrative hearing. (R. 26). His past work experience includes employment as a dishwasher, assembler, heavy equipment operator, rubber layer, and forklift operator. (R. 52). The claimant alleges he is unable to work because of mild mental retardation, anxiety, depression, lumbar degenerative disease, and hypertension. (R. 12, 333).

### *Physical and Mental Limitations*

The claimant took an IQ test in high school on February 20, 1985 and received a verbal score of 75, performance score of 76, and a full scale score of 75. (R. 323).

Dr. M.R. McClellan examined the claimant on December 4, 1995 after a car accident on April 15, 1995. He noted that the claimant reported having mid to low back and leg pain since the trauma of the accident. Further, he reported that his objective findings of tenderness and limitation of range of motion in the claimant's back and the claimant's subjective complaints

4

were consistent with those seen after the trauma of a motor vehicle accident. He recommended physical therapy as treatment for the claimant. (R. 420-21).

The claimant frequently visited Dr. Ronald J. Wheeler, a chiropractor, during the period November 18, 1994 to August 2, 2001, often visiting the doctor monthly or bimonthly and complaining of upper and lower back pain. (R. 211-28). Furthermore, the claimant also visited Dr. Wheeler from April 21, 2004 to January 27, 2005, complaining of lower back pain with the same frequency. (R. 229-54).

The claimant went to Northeast Alabama Regional Medical Center nine times between December 1, 2003 and March 8, 2007, complaining of severe back pain. (R. 263-304).

The claimant visited Patient First Healthcare on September 15, 2006 and October 1, 2006, complaining of high blood pressure. At this time, he reported that he drank twelve cans of beer per weekend and smoked three packs of cigars per weekend. (R. 257-60).

In an April 11, 2008 report filed with the Social Security Administration, the claimant stated that he could not read or write. He noted that, as a child, he was able to memorize stories, which is how he "got by" in school. He indicated that his depression began after the loss of his job in February 2007. Because of his depression, he stated that he had increased his beer consumption to as much as a twelve-pack each day. Furthermore, he indicated that his back pain started after his car accident about five years ago. He noted that doctors have told him he may have a herniated disc, and he believes he may have arthritis in his back. To relieve his pain, he says he uses a heating pad and over-the-counter medication. He reports that he has had high blood pressure for about ten years. However, while he admitted that medication he has taken in the past has controlled this condition, he can no longer afford the medication. (R. 130-31).

5

On April 20, 2008, Tywaunja Clark, the claimant's estranged wife, completed a DDS Daily Activities Questionnaire on claimant's behalf. According to the answers on that questionnaire, the claimant cannot read, even on a first grade level. He was in Special Education classes in school and received his driver's test verbally to obtain his driver's license. Based on the questionnaire responses, claimant's inability to read has caused him to lose several jobs. For example, he quit one job because he was embarrassed that he was unable to fill out a form; another after his coworkers laughed at him upon discovering that he could not read; and another after he was sent twice to fetch a certain cleaning solution and returned each time with the wrong item because he was not able to read the label. (R. 132-35).

Also on April 20, 2008, Tywaunja Clark completed a separate DDS Physical Activities Questionnaire on the claimant's behalf.  That questionnaire reflect that since the claimant's back injury, he  "doesn't do much of anything." He occasionally cuts the grass or bushes but does not do household chores. Often, doing yard work causes his back injury to flare up. According to the questionnaire answers, because of the claimant's back pain, he can stand for only ten minutes; he cannot walk at all; he can sit for only an hour; and he can perform most activities for only twenty minutes before he needs to take a break. (R. 145-50).

The third questionnaire completed on April 20, 2008 by Tywaunja Clark on the claimant's behalf was a DDS Drug and Alcohol Use Questionnaire.  According to the questionnaire responses, the claimant drinks alcohol daily, averaging "about a six pack of beer a day (two of them)." His estranged wife reported that he buys beer with "every penny" that his children give him. She noted that when he drinks he has a "very nasty attitude" and a "nasty mouth" and that alcohol changes his personality. She further indicated that in 1987, he was

6

admitted to Regional Medical Center because he was an alcoholic, had become depressed, and tried to kill himself. (R. 151-52).

On a prior disability report for the Social Security Administration, the claimant reported that he "can work good with [his] hands," but since he cannot read, he often cannot complete training activities. He has had trouble holding down a job because many jobs now involve computers, and people often find out he cannot read, which embarrasses him. (R. 154).

On April, 28, 2008, Dr. C.K. Jin of Anniston Medical Clinic, P.C. completed a Disability Determination of the claimant. He reviewed the evidence provided by the DDS and used those findings in his overall assessment of the patient. He wrote that the claimant's back problems of the past eight to nine years were likely due to lumbago or lumbar disc disease, although the claimant has never had an x-ray of his back. Further, he noted that while the claimant has an eight-year history of high blood pressure, he cannot afford to pay for his medication. In addition, he wrote that the claimant reported to drinking a twelve-pack of beer each day and using dip tobacco but not smoking cigarettes. Dr. Jin wrote that the claimant has "remarkable back problems" and is "not able to do anything because of severe pain." He recommended that an orthopedic doctor should evaluate the claimant to determine if he had lumbar disc disease. (R. 325-26).

Dr. Morton Rickless of the Orthopedic Clinic completed an x-ray of the claimant on May 19, 2008. He noted that the claimant had no evidence of a fracture or dislocation in his lumbar spine, and his vertebrae seemed to be well aligned. His assessment was that the x-rays looked normal for a lumbar spine with minimal arthritic changes. (R. 329).

Dr. Dana Davis completed a psychological evaluation of the claimant on May 21, 2008 at

the request of the DDS. She stated that while the claimant was cooperative, polite, and pleasant, he had below average intelligence and abstract thinking. She assessed the claimant with a verbal IQ of 71, a performance IQ of 70, and a full scale IQ of 68. In addition, she diagnosed him with hypertension, arthritis, and mild mental retardation, which she noted was consistent with the claimant's difficulty working in a school setting. Further, she wrote the claimant had no significant emotional problems. (R. 331-34).

On May 28, 2008, on a DDS Vocational Rationale Form, the DDS reported that the limitations outlined in the claimant's RFC assessment were consistent with the physical and mental requirements of the claimant's past relevant work as a dishwasher. (R. 161).

On May 29, 2008, Dr. Robert Estock completed a Mental RFC Assessment of the claimant. He noted the following abilities of the claimant were moderately limited: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods of time, and the ability to respond appropriately to changes in the work setting. He wrote the claimant was capable of understanding and remembering simple instructions over an eight-hour workday with routine breaks even though the claimant was mildly mentally retarded. Dr. Estock later completed a Psychiatric Review Technique Form on the claimant as well, noting the claimant had difficulties maintaining concentration, persistence, and pace. (R. 335-37, R. 340-48).

The claimant visited Dr. Ataur Rehman at the Northeast Alabama Regional Medical Center on September 13, 2008, complaining of chest pain in the emergency room. The doctor diagnosed him with hypertension and did not note anything else unusual about the claimant's health. (R. 354).

8

In an undated disability report, the claimant reported that his intellectual functioning limited his ability to work because it causes him embarrassment and prevents him from reading and writing. He also reported that he had "a lot of pain in [his] back." (R. 168). Furthermore, he reported in a Work History Report on January 9, 2009, as part of his current disability claim, that he would like to work, but because of his inability to read, he is still unable to work as a dishwasher. He claimed that he would not be able to know which solutions were used in the dishwashers or read the directions to start the machine. Furthermore, he reported that he has arthritis, severe high blood pressure, and severe back pain. (R. 183).

In a Function Report from January 9, 2009, the claimant reported that he could not stand or hold anything for long periods of time because his hands "swell up something awful" because of his arthritis. Furthermore, because his hands are often swollen, he cannot do much yard work and cannot go outside if the weather is very cold. In addition, he wrote that he was accustomed to hiding his illiteracy but because of an increase in the use of technology in the workplace, he cannot hide it anymore and is ashamed of it. He can follow directions if someone reads them to him in order and only two to three steps at a time. He gets confused otherwise. (R. 186-89).

Dr. Sathyan Iyer examined the claimant on February 24, 2009 at the request of the DDS. He diagnosed the claimant with possible degenerative joint disease of the lumbar spine with restricted range of motion and stiffness of the lower back. He also noted the claimant's hypertension was not controlled. In addition, he commented that in his current condition, the claimant would have significant impairment of functions involving standing, climbing, working at heights, lifting, and carrying. (R. 368-70).

Dr. Michelle Warren completed a Physical RFC Assessment of the claimant on March 2,

2009 at the request of the DDS. She noted the claimant could occasionally lift twenty pounds, frequently lift ten pounds and stand and sit for about six hours in an eight-hour workday. She noted the claimant was limited in his upper extremities and had postural limitations in his ability to climb, balance, stoop, kneel, crouch, and crawl. Dr. Warren commented that while the claimant complained of severe pain in his back, x-rays showed minimal changes in his spine. Thus, she considered his statements of pain to be only partially credible and not totally consistent with her objective findings. She did not give significant weight to the Medical Source Opinion of Dr. Iyer because of its inconsistencies with her assessment of the claimant. (R. 387-94).

Dr. Robert Estock completed another Mental RFC Assessment of the claimant on March 2, 2009 at the request of the DDS. He noted the same limitations as in his prior assessment. (R. 395-97).

In examining these new reports, the DDS concluded on March 2, 2009 that the claimant was able to return to his past relevant work as a rubber layer. (R. 192).

The claimant visited Dr. Gloria Browne at Tolbert Health Care on May 12, 2009, complaining of chronic back pain, pain in his feet, hypertension, and depression. She noted significant tenderness in his back and limitation in the range of motion of his spine. She diagnosed him with chronic lumbago, major depressive disorder, and hypertension. At follow-up visits to Tolbert Health Care on June 16, 2009 and March 19, 2010, Dr. Carey Goodman assessed the claimant with the same chronic medical ailments. (R. 422-29).

Dr. Carey Goodman also completed a physical capacity evaluation of the claimant on September 27, 2010. She reported the claimant could sit for two hours at a time, stand for two hours at a time, and walk for two hours at a time. He could do all of these activities only once

each in an eight-hour day. He could lift and carry up to twenty pounds and frequently up to twenty-five pounds. He could occasionally push and pull with his arms, legs, and feet. In addition, he could occasionally bend, squat, crawl, climb, and reach. Furthermore, he had a moderate restriction of activities involving an inability to drive automotive equipment and mild restriction of activities involving moving machinery, dust, fumes, and gases. His disability in his hands limits his abilities to manipulate and control machinery. Dr. Goodman assessed the claimant with moderate pain that would cause some handicap in the performance of his work, although he wrote that the claimant should be able to tolerate it. Because of this pain, the claimant would likely have to miss three or more days each month from work. (R. 439-41).

*The ALJ Hearing*

At a hearing held on June 11, 2010, the claimant's attorney showed the ALJ a note from December 14, 1995, demonstrating that a motor vehicle accident started the claimant's back pain. He claimed the pain has gotten progressively worse since that time. Further, the claimant's attorney moved to reopen the prior denial of May 29, 2008, since less than twelve months elapsed between that date and the claimant's second denial on March 3, 2009. (R. 21-23).

The claimant testified that the last job he worked was at Brown Brothers. He could not recall when this job was, but he noted that he has not worked at all since February 2007. The claimant stated that at Brown Brothers, he drove heavy equipment until his back began hurting him too badly. He says he worked there for about three years. (R. 27).

Before Brown Brothers, the claimant testified he worked at Mabby, a bus company. He stated that he "put the rubber inside the bus" for about three years. In addition, as part of the job, claimant said he was required to keep a book log. He testified he quit working there after several

11

employees discovered that he could not read and played a trick on him. In addition, he claims that he could not have continued working in that job regardless of the trick the other employees played on him because the company had started requiring its employees to pick up larger rolls of rubber, which he was not able to lift. (R. 28-29).

After working for the bus company, the claimant testified that he worked as a dishwasher for about a month. He stated that he left this job because he could not do the lifting the job required. Further, he testified that while he loaded and unloaded trucks in his youth, he would not be able to return to that type of job now because of his back problems. (R. 29-30).

The claimant testified that going to a chiropractor has helped his back problems in the past; however, now, since he is unemployed, he cannot afford to go to a chiropractor on a regular basis. (R. 31).

The claimant stated that on a scale of zero to ten where zero is the least pain and ten is unbearable pain that would put him in the emergency room, his pain when he first wakes up in the morning is generally a ten. He noted that taking his medicine enables him to get his pain level down to a five or a six for a period of about four to five hours. However, he claimed that if he tries to do physical activity like walking, his pain level rises again. (R. 32-33).

In addition, the claimant testified that he could not even walk a city block before having to sit down. He stated that he thinks he has arthritis in his ankle, which causes him a lot of pain. The claimant indicated that doctors have given him medicine for his ankle, but he still has "shooting pains going through it." In addition, he noted that he believes he has arthritis in his back and has problems bending, stooping, crawling, kneeling, and crouching. Yet, he stated that he has no trouble sitting down for a period of one to two hours without leaning. (R. 33-34).

12

The claimant stated that he has had problems with depression because he has been unable to work. He testified that he has worked two jobs for as long as he has been able to work, and now that he is unable to work to take care of his family, he has been depressed. He noted that if he were able to work, he would. He stated that he has been put on medication for depression but cannot remember the name of the medication. In addition, he testified that he takes a pain reliever for his back pain and a sleeping pill for sleeplessness caused by his depression. Furthermore, the claimant noted that he must take a nap for about an hour each day after he takes his pain medication. (R. 35-36).

While describing his daily activities, the claimant testified that, on a typical day, he takes his wife to work and his grandson to school and then begins to cut the grass. He stated that it takes him three days to cut the grass because he must take breaks often. After lunch each day, he says he does basic household chores like laundry, cooking, and occasionally, mopping. (R. 37-38).

Further, the claimant indicated that he did not score high enough on a test to get into the army; has never received a GED; and has never attended any sort of vocational training. He testified that he has a driver's license and drives his wife thirty minutes each way to work each day and his grandson twenty minutes each way to preschool each day. (R. 40).

The ALJ noted that the claimant's last reported earnings were not at Brown Brothers but from work at Lone Star Steak House as a part-time dishwasher. In addition, the ALJ asked about the claimant's past work at Boozer Laminated Beam Company where he largely transported wood from one building to another. The claimant testified that while he was at Boozer, he went to the chiropractor on a regular basis. (R. 42).

13

The ALJ further noted that while the claimant testified to taking medications for pain, depression, and high blood pressure, no official list of medications exists in the record. (R. 44).

The claimant stated that he regularly uses the telephone to talk to his son and daughters, goes to church each Sunday, and goes fishing on a regular basis. He testified that he does some yard work: mowing a yard that is a quarter of an acre, using a weed eater, and keeping a small garden. (R. 45-48).

In addition, the claimant indicated that when he goes to the store with his wife, he uses "one of them riding things" to get around the store. He stated that he often uses a "massager heating pad" for pain relief for his back. He testified that he drinks beer frequently, often drinking four or five beers at a time, but his drinking has never interfered with his ability to work during the day. (R. 50).

A vocational expert, Mr. Karl Weldon, testified that the claimant's work as a dishwasher and assembler would qualify as medium unskilled work, and his work as a heavy equipment and forklift operator would qualify as medium semi-skilled work. (R. 51-52).

The ALJ presented several hypotheticals to Mr. Weldon, the vocational expert. In the first hypothetical, the individual had a tenth grade education; was illiterate; had no severe physical or functional physical limitations; had mental limitations but was still capable of understanding and remembering and carrying out simple instructions over an eight-hour day with routine breaks; needed changes in the workplace to be introduced slowly; and needed contact with other people to be casual and non-confrontational. The vocational expert testified that this individual could return to work as a dishwasher or heavy equipment operator. (R. 53).

The second hypothetical the ALJ presented to Mr. Weldon involved the same mental

14

limitations but added several physical limitations. In this hypothetical, the individual would be "limited to light work, as defined in the social security regulations, his pushing and pulling will be limited to frequent bilaterally, same weights for lifting and carrying [as] light work. Posturally [], there would be some limitation; he should never climb a ladder, rope or scaffold. He could although however occasionally perform all [other] postural activities and he should avoid concentrated exposure to hazards." (R. 55).  The vocational expert testified that the individual in this hypothetical would be able to perform light unskilled work as a hand-packer or assembler. (R. 55).

The ALJ presented a third hypothetical to the vocational expert imposing additional physical limitations. In this hypothetical, the individual would be unable to walk a full city block and would need to lie down for about one hour each day in an unscheduled break. The vocational expert testified that no work would be available for such an individual. (R. 56).

The vocational expert further noted that none of the jobs listed under the first hypothetical would require any reading. He stated that while the dictionary of occupational titles does presume that everyone is literate in the national economy, he had taken the claimant's illiteracy into account when he indicated which jobs the claimant could perform. Furthermore, the vocational expert testified that if the individual were unable to focus and concentrate for less than two hour periods at a time, he would be unable to work. (R. 56-58).

*The ALJ Decision*

The ALJ found the claimant has not engaged in substantial gainful activity since February 15, 2007. In addition, he concluded that the claimant has the following severe combination of impairments: borderline intellectual functioning, anxiety and depression, lumbar degenerative

15

disc disease, and hypertension. He determined that these impairments were more than slight and in combination, did affect the claimant's ability to function. (R. 12)

Based on the claimant's work history and earnings record, the ALJ decided that the claimant's borderline intellectual functioning caused only a slight limitation in his ability to perform unskilled work and thus, was not very severe. In addition, he noted that illiteracy is a vocational not a medical factor and thus, is not a medically determinable impairment. Furthermore, the ALJ found that the claimant's anxiety and depression were severe. He then noted that no indication in the record existed that the claimant was being treated for depression by mental health experts, and the medicine prescribed by the treating physician seemed to control the claimant's depression. He stated that the examining psychologist found the claimant had no evidence of a mental impairment aside from illiteracy and mild mental retardation. Further, using the special technique, the ALJ determined that the claimant's documented mental impairments in combination have resulted in mild restriction of daily activities; mild restriction in social functioning; moderate limitations in concentration, persistence, and pace; and no documented episodes of decompensation. (R. 12-13).

The ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. In addition, he determined that the claimant has the RFC to perform a range of unskilled light work, except he can never climb ladders, ropes, and scaffolds, only ramps and stairs. Furthermore, he can only occasionally stoop, kneel, crouch, and crawl; frequently push and pull bilaterally; must always avoid concentrated exposure to hazards; can remember and carry out simple instructions over an eight-hour day with routine breaks; should have non-confrontational contact with coworkers,

supervisors, and the general public; and must have changes in the work place introduced slowly due to his mental limitations and illiteracy. (R. 13).

In evaluating the claimant's physical impairments using the three-part pain standard, the ALJ determined that while the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment. The ALJ noted that many of the x-rays of the claimant's back showed only minimal objective evidence of arthritic changes. However, Dr. Iyer found the claimant had hypertension, and a severely reduced range of motion in his spine. Yet, the ALJ gave little weight to Dr. Iyer's opinion because he claimed it was not supported by objective findings and was based on range of motion testing that was under the control of the claimant. In addition, the ALJ discussed another doctor's visit where the physical examination was unremarkable but for a severely reduced range of motion in the lumbar spine. Furthermore, the ALJ stated that the objective findings in the record showed only minimal degenerative changes that were not capable of causing the amount of pain and limitation testified to by the claimant. Because of these findings, the ALJ concluded that nothing in the medical evidence existed that would preclude the claimant from performing at the stated RFC level. (R. 14-16).

The ALJ further found that the claimant is unable to perform any past relevant work. However, he noted that jobs still exist in significant numbers in the national economy that the claimant can perform. For example, the ALJ stated that the claimant could work as a hand-packer, assembler, or a grader. Because of these findings, the ALJ concluded the claimant was not disabled. (R. 17).

## VI. DISCUSSION

The claimant argues that the ALJ's determination was the result of an improper application of a legal standard and was not supported by substantial evidence. This court agrees and will reverse and remand this case for proper application of the law and proper consideration of the evidence.

This court notes that not only did the ALJ improperly apply the applicable legal standard in this case, he did not even mention the standard for establishing an impairment under listing 12.05(C) in the "Applicable Law" section of his opinion. To establish a disability under section 12.05(C), a claimant must present evidence of a valid verbal, performance, or full-scale IQ score of between 60 and 70 inclusive, and of a physical or other mental impairment imposing additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05(C) (1992). In addition, the general introduction on "mental retardation and autism" provides that a section 12.05(C) claimant must demonstrate that the retardation is a lifelong condition that manifested itself before age twenty-two. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05 (1992).

Generally, a claimant meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a valid IQ score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than "minimal effect" on the claimant's ability to perform basic work activities. *Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985). The Eleventh Circuit, however, has recognized that a valid IQ score need not be conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record on the claimant's daily activities and behavior. *Popp v. Heckler*, 779 F.2d 1497, 1499

(11th Cir. 1986) (rejecting a claim of section 12.05(C) mental retardation where the claimant's IQ score of 69 was inconsistent with evidence that he had a two-year college associate's degree; was enrolled in a third year of college as a history major; and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher). Although the law gives the ALJ some leeway to evaluate other evidence when determining the validity of an IQ score, an ALJ may not consider a claimant's age, education and work experience after the ALJ accepts the I.Q. score as valid and finds that the claimant meets or equals the criteria of a listed impairment. *See Ambers v. Heckler*, 736 F.2d 1467, 1470 (11th Cir. 1984) ("consideration of the fact that [claimant] could return to her past work is not a relevant inquiry once she has met the Listing of Impairments in Appendix 1"); 20 C.F.R. § 404.1520(d).

In the instant case, the ALJ's reasoning for his finding that the claimant is of borderline intellectual functioning instead of mildly mentally retarded is ambiguous. The record indicates that the claimant has a verbal IQ of 71, a performance IQ of 70, and a full scale IQ of 68. The ALJ seems to have chosen the highest IQ score of 71 instead of taking the lowest score of 68 to assess the claimant's mental functioning. *See Ambers v. Heckler*, 736 F.2d 1467, 1470 (11th Cir. 1984). In addition, the ALJ never stated that the scores of 68 and 70, which would qualify the claimant for 12.05(C) analysis, were invalid.

The ALJ in the present case incorrectly used the claimant's past work history as a forklift driver and heavy equipment operator to assess the claimant's mental impairment. *See Ambers*, 736 F.2d at 1468 (holding that when a claimant meets the listing, she is entitled to benefits regardless of the fact that she may be able to hold the same gainful employment as she did in the past as a domestic). Once the ALJ accepts the claimant's IQ score as valid, he may not consider

the claimant's work experience in determining whether the claimant meets the listing. *Id.* Thus, in the instant case, the ALJ erred in using the claimant's past work experience to place him in the category of borderline intellectual functioning instead of mild mental retardation.

However, the Eleventh Circuit has recognized that a valid IQ score need not be conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record on the claimant's daily activities and behavior. *See Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986). Yet, here, the ALJ has not presented substantial evidence to support his decision that the claimant's IQ score is inconsistent with other evidence in the record. He relies heavily on his own observations of the claimant at the hearing, instead of the expert opinion of Dr. Davis that diagnosed the claimant with mild mental retardation. Thus, the ALJ did not have substantial evidence to conclude that the claimant's IQ score was inconsistent with the other evidence in the record.

The ALJ failed to assess whether the claimant's impairment manifested before the age of twenty-two as required under 12.05(C). In the instant case, the claimant presented a high school IQ test taken on February 20, 1985 given by the special education program at his high school. The claimant's IQ on this test was in the borderline range, within a few points of his most recent IQ scores, suggesting that the claimant's mental impairment had manifested before the age of twenty-two. In addition, a diagnosis of mild mental retardation at present is consistent with the claimant's illiteracy and his taking special education classes while in the Anniston City School system.

Additionally, the ALJ in this case did not analyze the claimant's additional mental and physical impairments in combination with his mental retardation, as he is required to do under

20

12.05(C). The ALJ failed to address whether an additional physical or mental impairment imposes significant work-related limitations of function. To meet this requirement under 12.05(C), the additional physical or mental impairment need not be severe, only more than slight. *See Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985) (concluding that a claimant with a valid IQ of 67 and chronic obstructive lung disease and exercise-induced asthma satisfied the requirements for section 12.05(C) disability, even though the evidence established that the additional impairments were not, of themselves, disabling because the claimant was doing well with medications and controlling his exercise).

The ALJ did not analyze the claimant's symptoms using the standard required in 12.05(C). Instead, he used the Eleventh Circuit's three-part pain standard to determine if the claimant's pain symptoms were debilitating *independent* of the claimant's mild mental retardation, instead of in *combination* with his mental impairment. The ALJ should have determined whether the claimant's lumbar degenerative disc disease, anxiety, depression, and hypertension had a more than slight or minimal effect on his ability to work, not whether they rendered him completely unable to work independently of his mental defect. *See Davis v. Shalala*, 985 F.2d 528, 532 (holding that a claimant's alleged allergies and mild carpal tunnel syndrome imposed more than a slight or minimal, even though less than a severe, limitation on her functional abilities).

Therefore, in the instant case, the ALJ erred in his application of the legal standard for meeting the 12.05(C) listing by failing to do the following: use the claimant's lowest IQ score to assess the claimant's mental functioning; provide substantial evidence that the claimant's IQ scores are inconsistent with his daily activities; assess whether the claimant's impairment

manifested before the age of twenty-two; and determine if the claimant's physical impairments constituted a significant as opposed to a severe impairment.

Because the first issue on appeal is meritorious, the court does not need to address any further issues. However, the court notes that, upon remand, the ALJ should consider several other matters that troubled this court and would also call into question whether substantial evidence supports the remainder of the ALJ's decision:

(1) whether the ALJ committed error when according little weight to the opinion of Dr. Iyer although his diagnosis was supported by Dr. Iyer's own objective findings, as well as a May 12, 2009 exam at Tolbert Health Care;

(2) whether the ALJ properly included yard work in the list of the claimant's daily activities without acknowledging that mowing his lawn takes the claimant over three days to complete and causes him severe back pain; and

(3) whether the ALJ improperly rejected the testimony of the claimant and his doctor regarding limitations to the claimant's range of motion without stating explicit reasons for the rejection.

## VII. CONCLUSION

For the reasons stated, this court concludes that the ALJ failed to apply the appropriate legal standard in 12.05(C) to assess whether the claimant has a listed impairment.  Therefore, the court will REVERSE the Commissioner's decision and will REMAND it for the ALJ to determine whether the claimant is entitled to Disability or Disability Insurance Benefits. The

court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 20th day of September, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE